## Richmond

### Nancy C. Coleman v. Nationwide Life Insurance Company.

March 8, 1971.

Record No. 7305.

Present, All the Justices.

L. *Garland Wells,* for plaintiff in error.

*James N. Garrett, Jr. (Garrett, Garrett & Garrett,* on brief), for defendant in error.

Snead, C.J., delivered the opinion of the court.

Nancy C. Coleman, widow of Ray E. Coleman, instituted an action

against Nationwide Life Insurance Company to recover a judgment for money due her as named beneficiary under a certain life insurance policy issued to her husband. Nationwide defended on the ground that the policy had lapsed before Coleman's death. Mrs. Coleman contended, among other things, that the company, by its conduct, was estopped to assert the policy had lapsed, and that it had waived certain requirements for reinstatement of the policy. The jury returned a verdict for Mrs. Coleman in the sum of $6,378.80. Upon motion of Nationwide the trial court set aside the verdict as being contrary to the law and evidence and entered summary judgment for Nationwide. We granted Mrs. Coleman a writ of error.

The dominant issue for our determination is whether the evidence was sufficient to support a finding that Nationwide was either estopped to assert the lapse of the policy or that it had waived certain requirements for reinstatement of the lapsed policy.

Ray E. Coleman was an insured under two life insurance policies issued to him by Nationwide. One was a family policy (# 522391) that was in force and paid by the company upon his death, and the other was a decreasing term policy (# 522392) which was issued on September 12, 1958. The monthly premium on the term policy was $5.60 and payment was due on the twelfth day of each month. The term policy is the subject of controversy in this appeal.

On November 15, 1967 Coleman wrote a letter to Nationwide at its home office in Columbus, Ohio about his term policy. In it he stated, "I would like very much to cash it in for its surrender value at this time." Before writing the letter Coleman had talked on the telephone with Frank Parks, a Nationwide agent, concerning the proposed transaction. The following day Parks came to the Colemans' home, but only Coleman's wife and daughter were there. According to Vivian Gregory, the Colemans' daughter, Parks told her mother that cashing the policy would not mean it would be canceled. "Mr. Parker [Parks] said that when my father got the money that if he wanted to start his premuims (sic) right back up again he could and the policy wouldn't be cancelled."

Nationwide answered Coleman's letter on November 30, 1967. It informed Coleman that there was no cash surrender value on his term policy, but that if the policy were surrendered the accumulated dividends of $134.72 would be sent to him. The accumulated dividends were the only monetary value the term policy had. The letter stated that since Coleman also owned a family policy which did have a cash value Nationwide questioned whether this was the policy

Coleman desired to surrender. However, Nationwide expressly stated it was not suggesting that either policy should be surrendered, but Coleman was requested to inform Nationwide which policy he intended to surrender. The letter also told Coleman that his term policy would lapse automatically on December 12, 1967 if no more premiums were paid.

Upon receipt of the November 30th letter from Nationwide, Coleman wrote on the face of the letter, "I want to keep my family policy" and then returned it by mail to Nationwide. Again, on January 26, 1968 Coleman wrote Nationwide. He stated that he had been sick in the hospital and wanted to "cash in" his term policy but keep the family policy. He also stated that he did not need the term policy "at this time". Following receipt of this letter Nationwide issued a check, dated February 9, 1968, payable to Coleman in the sum of $134.72 for the accumulated dividends on the term policy. Both Coleman and Mrs. Coleman endorsed the check and it was cashed.

According to Ralph Yoder, manager of Nationwide's underwriting department, the company received early in March, 1968 four checks payable to its order drawn by Mrs. Coleman numbered 309, 310, 312 and 325. Checks Nos. 309 and 310 were dated January 1, 1968 and February 1, 1968 respectively. Check No. 325 was dated March 3, 1968 and bore the notation, "For Dec. payment". Each of these checks was for the sum of $5.60. Check No. 312 was dated March 3, 1968 and in the amount of $31.13. (This check was for the March premium of $25.53 on the family policy and $5.60 on the term policy). All of these checks were deposited to Nationwide's credit. However, the proceeds were not entered as premium receipts but were held as "suspense" items.

On March 15, 1968 Nationwide wrote Coleman acknowledging receipt of the back premiums of $22.40 on the term policy. The letter also stated that the term policy had lapsed because the payments were received too late to be applied, and that the payments would be held until he had an opportunity to comply with the reinstatement requirements of the company.[1] An application for reinstatement

---

[1] Paragraph 13 of Coleman's policy provided: "Reinstatement—Should this policy lapse because of default in payment of any premium, it may be reinstated at any time within three years after the due date of the first premium in default, upon presentation of evidence satisfactory to the Company of the insurability, including good health, of the Insured, together with the payment of all premiums in arrears with compound interest thereon to the date of reinstatement at the rate of 5% per annum."

was enclosed with this letter. Coleman answered the questions[2] contained in the application, but he failed to date, sign and secure the signature of a witness. He wrote on the back of Nationwide's letter to him that he was "very sorry this have (sic) happened"; that he did not want to lose his policy, and that he would forward at least $30 on April 12. (According to Mrs. Coleman, he intended to repay the dividends on the policy received from the company in February).

Nationwide, on March 25, 1968, returned the incomplete reinstatement form to Coleman for it to be dated and signed, and his signature witnessed. He was also requested to delete from the application certain information he had given concerning his wife and children since the policy did not cover them. Coleman completed the application which he dated March 30, 1968, and it was received by Nationwide along with a payment of $50 on April 9, 1968. Above his signature, the application stated in bold print, "IT IS UNDERSTOOD AND AGREED THAT: * * * (3) Any payment of premium made in connection with this application or any receipt therefor, shall not be binding upon the Company, nor shall the policy be considered reinstated, until this application is approved by the Company at its Home Office in Columbus, Ohio, during the lifetime and continued insurability of all persons insured under said policy. * * *"

Before this reinstatement application had been approved by the company Coleman died suddenly on April 16, 1968 as a result of an acute coronary occlusion. The company received notice of his death on April 18. It denied coverage and returned the next day all payments made on the term policy since its lapse.

Paragraph 4 of Coleman's policy provided that at the end of the second year and annually thereafter the policy would be credited with a dividend as ascertained and apportioned by the company. At the option of the insured the dividends could be either (a) "Paid in cash, or (b) Applied within the grace period toward the payment of any premium due on this Policy if the balance of such premium is duly paid, or (c) Left to accumulate to the credit of this Policy with interest at not less than $2\frac{1}{2}\%$ compounded annually." In its correspondence with Coleman about cashing in the term policy Nationwide made no reference to this provision.

■ In *Trayer* v. *Bristol Parking Inc.*, 198 Va. 595, 604-05, 95 S.E.2d 224, 231 (1956) we stated the necessary elements of the doctrine of estoppel. They are, " '(1) There must have been a false

---

(2) Coleman falsely stated that he had not been in the hospital since 1942.

representation or concealment of a material fact; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of the matter; (4) it must have been made with the intention that the other party should act upon it; and (5) the other party must have been induced to act upon it.' "

A waiver takes place when a known right is intentionally relinquished. Both legal rights and contract rights can be waived either expressly or by implication by the person holding them. Yet, where an implied waiver is relied upon it must be established by clear and unmistakable proof. *Creteau v. Phoenix Assurance Co.*, 202 Va. 641, 644, 119 S.E.2d 336, 339 (1961); *Roenke v. Va. Farm Bureau Ins. Co.*, 209 Va. 128, 134-35, 161 S.E.2d 704, 709 (1968).

The evidence is conclusive that Coleman's policy lapsed on December 12, 1967. Mrs. Coleman admitted she knew her husband had canceled his policy, and further that he later made application to reinstate it. Also, after her husband had cashed the check for the accumulated dividends, dated February 9, 1968, Mrs. Coleman said he "started his payments [premiums] right back up". Her check No. 325, dated March 3, 1968, bore a notation in her handwriting, "For December payment." Finally, Coleman himself never questioned in any manner the company's statement in its letter to him of March 15 that his policy had lapsed because the payments were received too late to be applied. He wrote the company that he was sorry this had happened and returned the application for reinstatement of his policy.

Mrs. Coleman argues that Parks, Nationwide's agent, misled her husband when he said the policy could be "cashed in" and it would not mean the policy would be canceled. But Mrs. Coleman cannot rely on statements made by Parks, because thereafter the company in its letter to Coleman, dated November 30, 1967, specifically advised him that the policy had no cash surrender value and would lapse on December 12 if that month's premium was not paid. Also, Mrs. Coleman contends the company's letters did not advise that the dividends were payable without cancellation of the policy, hence they were misleading. However, the policy itself, under paragraph 4, clearly provided that Coleman had the option to withdraw dividends without cancelling the policy. Furthermore, Coleman was not seeking advice when he wrote Nationwide. The company's letter of November 30th was for the purpose of determining whether Coleman really intended to surrender his family policy instead of his term policy, since the family policy did have a cash surrender value. The letter

did not advise or suggest what course of action Coleman should take. In no other correspondence with Coleman did Nationwide make any false statements or conceal any material facts.

Nationwide told Coleman in its letter of March 25, that it was pleased he had expressed a "desire to reinstate" his valuable insurance coverage. This statement cannot be construed as an approval by the company of his application. In the same letter the company stated that it was returning the reinstatement application since it was not executed as required. If Nationwide had intended to waive the reinstatement requirements there would have been no reason to return the application for Coleman to complete.

The completed application for reinstatement of the policy was received by Nationwide on April 9, 1968. Mrs. Coleman contends that the company impliedly waived its reinstatement requirements by not acting upon the application within the seven days it had possession of the application prior to the insured's death. We find that under the circumstances of this case the delay was reasonable and that this contention is without merit.

We hold that the evidence adduced falls short of being sufficient to sustain a finding that Nationwide was either estopped to assert the lapse of the policy or that it had waived its reinstatement requirements. Accordingly the judgment appealed from is

*Affirmed.*